UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| RHEA MILARDO, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | 3:13-cv-01232-VAB |
| v. | : | |
| | : | |
| TOWN OF WESTBROOK, | : | AUGUST 10, 2015 |
| | : | |
| Defendant. | : | |

**RULING ON DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Rhea Milardo, brought this action under 42 U.S.C. § 1983 against the

Town of Westbrook, Connecticut ("the Town" or "Westbrook") alleging that it retaliated

against her because of her protected speech in violation of the First Amendment.  The

Town has moved for summary judgment.  For the reasons that follow, the motion is

GRANTED.

**I.      BACKGROUND**

Plaintiff formerly served as a part-time constable in Westbrook, Connecticut.

ECF No. 35-2 ¶¶ 1-3; ECF No. 36-1 ¶¶ 1-3.  During her time as a constable, Milardo

was employed by the Town and supervised by a Connecticut Resident State Trooper

assigned to Westbrook (which lacks a stand-alone police department).  *Id.*  She was

also a member of Westbrook Police Union, Local 1257 (the "Union").  ECF No. 35-2 ¶ 4;

ECF No. 36-1 ¶ 4.

In March 2003, Milardo filed a lawsuit ("*Milardo I*") naming as defendants the

Town, the Union, and a co-worker named Douglas Senn.  ECF No. 35-5.  Her complaint

alleged that Senn had discriminated against her because of her gender and that the

Town and Union had sanctioned his conduct.  *See generally id.*  The case settled in December 2004.  ECF No. 35-2 ¶ 8; ECF No. 36-1 ¶ 8.

Following the disposition of *Milardo I*, the record discloses nothing of note until June 18, 2008.  On the evening of June 18, Milardo was assigned to marine patrol with another constable, Roger Powers.  ECF No. 35-2 ¶¶ 9-10; ECF No. 36-1 ¶¶ 9-10.  The two decided to forego marine patrol (which involves monitoring the Town's shoreline in a boat) because of strong thunderstorms.  ECF No. 35-2 ¶ 11; ECF No. 36-1 ¶ 11.  They patrolled by car instead.  *Id.*

Around 7:45 p.m., Powers parked their cruiser outside a mini-mart, and Milardo went inside.  ECF No. 35-2 ¶¶ 12-13; ECF No. 36-1 ¶¶ 12-13.  While Powers waited alone in the car, he received a tip from a concerned citizen: about half a mile away, a woman was standing alone in a field, arms outstretched, looking upward into the storm.  ECF No. 35-2 ¶¶ 14-15; ECF No. 36-1 ¶¶ 14-15.  The tipper expressed concern for the woman's safety.  ECF No. 35-2 ¶ 16; ECF No. 36-1 ¶ 16.  By the time Milardo exited the mini-mart and entered the cruiser, Powers was calling dispatch about the woman in the field.  ECF No. 35-2, ¶ 18; ECF No. 36-1, ¶ 18.  In a later investigation, Milardo would tell state and local authorities that she heard Powers describe the woman's circumstances.  ECF No. 35-2 ¶¶ 38-40; ECF No. 36-1 ¶¶ 38-40.

After ending the call to dispatch, Powers and Milardo did not immediately drive to the field to check on the woman.  They instead drove to the marina where the police boat was docked, spent ten minutes checking its bilge pumps, responded to another call at a different location, and stayed there for five or ten minutes.  ECF No. 35-2 ¶¶ 21-24; ECF No. 36-1 ¶¶ 21-24.  Only then did they drive to the field.  ECF No. 35-2 ¶ 25; ECF

No. 36-1 ¶ 25.  Arriving, they did not exit their cruiser, but looked out the windows in an effort to spot the woman.  ECF No. 35-2 ¶ 26; ECF No. 36-1 ¶ 26.  They did not see her and left.  ECF No. 35-2 ¶ 27; ECF No. 36-1 ¶ 27.  The next morning, the woman's body was found in Long Island Sound not far from the field.  ECF No. 35-2 ¶ 29; ECF No. 36-1 ¶ 29.

The State Police and the Town investigated the incident, and Milardo was placed on paid administrative leave.  ECF No. 35-2 ¶¶ 32-46; ECF No. 36-1 ¶¶ 32-46.  In January 2009, the Westbrook Board of Selectmen determined that Milardo's failure to promptly come to the woman's aid constituted neglect of duty.  It terminated her employment.  Powers was also terminated.  ECF No. 35-2 ¶¶ 49-50; ECF No. 36-1 ¶¶ 49-50.

Milardo responded by filing a grievance.  ECF No. 35-2 ¶ 51; ECF No. 36-1 ¶ 51. In February 2012, the Connecticut State Board of Mediation and Arbitration ("SBMA") determined that Milardo's conduct had not warranted termination under the Union's contract with the Town.  It reduced her penalty to a three-year suspension that ended on February 12, 2012.  ECF No. 35-2 ¶ 68; ECF No. 36-1 ¶ 68.  The Town appealed the SBMA's decision in state court but withdrew the appeal on June 29, 2012.  ECF No. 35-2 ¶ 73; ECF No. 36-1 ¶ 73.  The plaintiff alleges that, after withdrawing its appeal, the Town attempted to negotiate her resignation, but she refused.[1]  Compl. ¶¶ 21, 23.

At that time, however, Milardo had not served as a constable for some three and a half years, and her certification as an officer had lapsed on June 30, 2011.  ECF No.

---

[1]  Plaintiff submitted no evidence of these alleged negotiations.  Nonetheless, the Court concludes *infra* that the any alleged speech in connection with such negotiations was not protected by the First Amendment.

35-2 ¶ 71; ECF No. 36-1 ¶ 71.  To obtain recertification, the Town required her to attend the Connecticut State Police Academy ("the Academy"), a six-month residential training program.[2]  ECF No. 35-2 ¶ 74; ECF No. 36-1 ¶ 74.  In August, the Town arranged Milardo's enrollment in Academy session 340, scheduled to begin on January 4, 2013.  ECF No. 35-2 ¶ 75; ECF No. 36-1 ¶ 75.

On August 27, 2012, the Town sent a letter notifying Milardo of her enrollment.  ECF No. 35-29; ECF No. 35-47 ¶ 20.  It directed the letter to an address identified in its records as Milardo's.[3]  ECF No. 35-47 ¶ 22.  The plaintiff, however, had moved, leaving only her ex-husband at that location.  ECF No. 35-44 at 238.  Milardo never received the letter.  *Id.*  The correspondence was also carbon-copied to Milardo's union attorney, but Milardo did not receive notice of her enrollment that way either.  *Id.* at 236.  The Town sent another notification letter on November 15 (also carbon-copied to the plaintiff's union attorney), this time by certified mail.  It was signed for by "E. Milardo" at the location to which it was addressed.  ECF No. 35-2 ¶¶ 80–82; ECF No. 36-1 ¶¶ 80–82; ECF No. 36-1, (B) ¶¶ 9, 10.  The signing "E. Milardo" was evidently Milardo's ex-husband, and neither that letter nor the one sent to her attorney found its way to the

---

[2] At her deposition, the plaintiff testified that when an officer's certification lapses and she does not obtain recertification within a year, the Town has authority to permit her to complete a one-week training course instead of the six-month Academy training.  ECF No. 36-3 at 221, 272.  In the fall of 2012, the Town explained its decision not to waive the Academy requirement by pointing to Milardo's long absence from law enforcement and her "history."  *See* ECF No. 37-3 at 5.

[3] The plaintiff denies the Town's assertion that it sent the letter to her last known address that it had on file, ECF No. 36-1 ¶ 79, but offers no evidence to the contrary.  Milardo's bare denial carries no weight at summary judgment.  *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (internal quotation marks and citation omitted).

plaintiff.[4]  Milardo did not receive her enrollment materials until December 14.  ECF No. 35-2 ¶ 85; ECF No. 36-1 ¶ 85.

On receipt of her notification, Milardo perceived two difficulties.  First, the materials included forms that needed to be signed by the Town, and participation in the Academy required certain equipment to be furnished by Westbrook.  The forms did not yet have the requisite signatures, ECF No. 36-3 at 263, and Milardo lacked some of the required equipment, *id.* at 267.  Milardo never personally notified the Town about this issue, but her lawyer told her that he was in contact with the Town's attorney.[5]  The forms were never signed and the Town never provided the equipment.

Second, the Academy required Milardo to obtain clearance to engage in physical training by undergoing a medical examination.  ECF No. 35-2 ¶ 87; ECF No. 36-1 ¶ 87.  Milardo tried to arrange an appointment with a doctor she had never seen before, but the earliest date she could secure was January 7 or 8 – several days after the start of

---

[4] The defendant points to an affidavit from Karen Boisvert, a training officer at the Academy, to show that Milardo had notice of her January enrollment.  Boisvert stated in her affidavit that, in a September conversation, Milardo acknowledged to her that she was enrolled in the January Academy class.  ECF No. 35-49 at 2.  But the plaintiff testified in her deposition that she did not receive any notification of her enrollment until December.  ECF No. 36-3, at 232:12-14.  On the defendant's motion for summary judgment, the Court must resolve this factual contest in the plaintiff's favor.

[5] In her deposition, Milardo testified that although she never told the Town about the forms or the equipment, she did tell her lawyer.  ECF No. 36-3 at 264–65.  She also stated that her lawyer told Town officers about the problems: "He told me, I don't know how many times . . . . he was in contact with [the Town's attorney] multiple times," and "I believe [the attorney] was in contact with [Town officials] multiple times."  ECF No. 35-44, at 268; ECF No. 36-3, at 265, 269.  The Town argues that the statement made by Milardo's lawyer (that he was in contact with the Town's attorney "multiple times") is inadmissible hearsay that cannot be considered on summary judgment.  However, while a party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), this simply means that the evidence must be capable of presentation in admissible form at the time of trial; it does not require that the materials be presented in an admissible form on summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.  Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses.").  Because Milardo's lawyer would be able to testify at a trial that he was in contact with the Town's attorney multiple times regarding the forms and equipment, his hearsay statement on that point may be considered on summary judgment.

the Academy.  ECF No. 35-2 ¶¶ 89-92; ECF No. 36-1 ¶¶ 89-92; ECF No. 35-44, at 259.

The Town learned of this trouble.  On December 18, its attorney e-mailed Milardo's

lawyer to notify him that the Town had arranged for Milardo to be seen by a different

physician before the start of the Academy.  ECF No. 35-33 at 2.

The plaintiff declined the Town's offer.  ECF No. 35-2 ¶ 96; ECF No. 36-1 ¶ 96.

In her deposition, she stated that she preferred to see a doctor of her own choosing

because she doubted that the Town's proffered physician would maintain her as a

patient in the future.  ECF No. 35-44, at 262.  Milardo also admitted that she knew that

her failure to see a doctor before January 4 would preclude her from taking part in the

Academy.  *Id.* at 262–63.

When the first day of the Academy arrived on January 4, the plaintiff did not

attend.  ECF No. 35-2 ¶ 99; ECF No. 36-1 ¶ 99.  On January 8, her attorney wrote a

letter to the Town charging that its failure to provide Milardo with needed materials had

prevented Milardo from participating.  ECF No. 35-36.  The Board of Selectmen then

terminated her employment based on her failure to attend the Academy.  ECF No. 35-2

¶ 106; ECF No. 36-1 ¶ 106.

## II.   DISCUSSION

Milardo brought this lawsuit under 42 U.S.C. § 1983 alleging that the Town

violated her First Amendment rights by retaliating against her for engaging in protected

speech.  To make out the elements of her case, she must show that "(1) the speech at

issue was made as a citizen on matters of public concern rather than as an employee

on matters of personal interest, . . . (2) . . . she suffered an adverse employment action,

. . . and (3) the speech was at least a substantial or motivating factor in the [adverse

employment action]." *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (quoting *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003)). If such a showing is made, the defendant may escape liability if it demonstrates "by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003).

Milardo identifies a handful of instances of protected speech, including filing *Milardo I*, ECF No. 1 ¶ 6, lodging a complaint with the Town when the Resident State Trooper allegedly harassed her about *Milardo I*, *id.* ¶ 8, rejecting the defendant's attempt to secure her resignation through settlement, *id.* ¶ 23, grieving her 2009 termination, *id.* ¶ 14, and accusing the Town (through her attorney) of preventing her from attending the Academy, *id.* ¶ 27. Milardo asserts that the defendant retaliated against her by forcing her to attend the January Academy session instead of an earlier session or a one-week recertification program, by refusing to provide her with materials for the Academy, and by terminating her employment. The Town argues that Milardo did not engage in protected speech and that it did not retaliate against her for anything that she said. It asserts that all of its decisions about Milardo's employment were justified either by her careless behavior on June 18, 2008 or by her failure to attend the Academy. The Town also contends that under the law of municipal liability, it cannot be charged with the Board of Selectmen's decision to fire the plaintiff.

### A.    Standard of Review

On a motion for summary judgment, the Court's limited role is to determine whether the record presents triable issues. Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it might influence the outcome of the case under governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" if the evidence would permit a reasonable juror to decide the point in favor of the non-movant.  *Id.*  The Court must view the record evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in the non-movant's favor.  *Gallo v. Prudential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

### B.   Municipal Liability

Under § 1983, a municipality is not strictly liable for the constitutional torts of its employees.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  Rather, municipal liability attaches only when execution of the municipality's "policy or custom" inflicts injury.  *Id.* at 694.  Municipal policy is reflected in the decisions of those local officials who "possess[] final authority to establish municipal policy with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986).  A subordinate whose decisions are "subject to review by the muncipality's authorized policymakers" is not a final decisionmaker in the estimation of § 1983, and her decisions neither represent municipal policy nor subject her employer to liability.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  Whether an official has "final policymaking authority" is a question for the Court and must be determined by reference to state law.  *Id.* at 123.

The defendant argues that the Board of Selectmen's decision to terminate Milardo's employment does not give rise to municipal liability because the Board lacks "final policymaking authority" concerning personnel decisions.  The Town submits that

the collective bargaining agreement between the Union and the Town permits an employee to grieve a Board decision before the SBMA.  As a result, it argues, the Board's determinations are "subject to meaningful review" by the SBMA, which means that the Board does not have final policymaking authority.

The Court disagrees.  Whether the Board is a policymaker for the Town depends on whether its word is final within the Town's structure of government, not on whether a neutral decisionmaker ultimately can undo its decisions.  Indeed, if the possibility of review by a neutral third-party sufficed to negate final policymaking authority at the municipal level, the existence of the judiciary (which can generally undo a municipality's unlawful decisions) would nullify the doctrine of *Pembauer* and *Praprotnik*.  *See Everitt v. DeMarco*, 704 F. Supp. 2d 122, 139 (D. Conn. 2010) (rejecting argument that police commission did not have final policymaking authority because its decision was subject to review by SBMA and noting that it "would lead to the illogical conclusion that the Commission lacks final policymaking authority because this Court could ultimately decide that the Defendants' conduct was unconstitutional and therefore overturn its decision").  Under state and local law, the Board's personnel decisions cannot be reviewed by another municipal entity.  Westbrook is therefore properly charged with the Board's decision to fire Milardo.

The cases cited by Westbrook are distinguishable because higher levels of review and policymaking existed within the municipality at issue.  For instance, in *Albert v. City of Hartford*, 529 F. Supp. 2d 311, 330–31  (D. Conn. 2007), the court held that a Hartford police chief was not a policymaker because his authority to hire and fire employees was constrained by the city's charter, city manager, personnel rules, and

Court of Common Council – all within the municipality's structure of government. Similarly, in *McDonald v. Bd. of Educ. of City of New York*, No. 01 CIV.1991 NRB, 2003 WL 21782685, at *3 (S.D.N.Y. July 31, 2003), the court held that a school district administrator was not a policymaker in part because a New York state statute expressly provided that only the board of education had final authority to approve discontinuance of a teacher's probationary service, and because the chancellor of the New York City Board of Education needed to sign the report of a Board of Education hearing officer regarding the plaintiff's performance rating.

### C.    Timeliness

The statute of limitations in this § 1983 case is three years, and the plaintiff filed suit on August 26, 2013.  *See Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005) (limitation period for § 1983 claim in Connecticut is three years).  The defendant argues that some of the conduct described in the complaint, such as harassment by the Resident State Trooper and Milardo's first termination, occurred prior to August 26, 2010 and is therefore not actionable.  Milardo agrees.[6]  *See* ECF No. 36 at 4.  The Court joins the parties' conclusion; the only actionable instances of alleged retaliation are those that occurred in connection with Milardo's reinstatement, failure to attend the Academy, and ultimate termination.

### D.    Protected Speech

When the government acts as an employer it has significant latitude to control the speech of its employees.  An employee's speech is unprotected unless the

---

[6] She does, however, correctly point out that these actions are appropriately considered as background evidence in support of her claim.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

employee speaks as a citizen on a matter of public concern.  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

### 1.    As a Citizen

Under *Garcetti*, an employee's speech is not protected at all if she speaks in her capacity as a government employee instead of in her capacity as a citizen.  *Garcetti*, 547 U.S. at 418.  This inquiry is a "practical one" that seeks to determine whether the employee spoke pursuant to his or her official responsibilities.  *Id.* at 421, 424.  If speech "owes its existence to a public employee's professional responsibilities," *Garcetti* reasons, restricting it does not infringe the employee's First Amendment freedoms.  *Id.* at 421.

The defendant argues that, with the exception of *Milardo I*, none of the speech identified in the plaintiff's complaint is protected under *Garcetti*.  These instances of speech include: a complaint made by Milardo on June 12, 2008, stating that the Resident State Trooper was harassing her because of *Milardo I*; her January 2009 grievance contesting her first termination; Milardo's alleged rejection of the Town's attempt to negotiate her resignation in October 2012; and Milardo's attorney's letter to the defendant, sent on January 8, 2013, alleging that Westbrook's failure to provide the plaintiff with needed equipment prevented her from attending the Academy.  In support of its argument, the Town cites a number of Second Circuit cases that apply *Garcetti* to reject First Amendment claims based on internal complaints and union grievances. ECF No. 35-1 at 23-27.

Responding to the "litany" of cases marshaled by the defendant, Milardo writes: "[I]f that is the Second Circuit law at this point the plaintiff submits that it is, indeed, an

unwarranted extension of the law and does not comport with Supreme Court precedent." ECF No. 36 at 8.

Whether Second Circuit precedent concerning employee speech comports with *Garcetti* itself is irrelevant. This Court has no authority to overrule the line of Second Circuit cases interpreting *Garcetti*. This Court concludes that *Weintraub v. Bd. of Educ.*, 593 F.3d 196 (2d Cir.) and its progeny compel the conclusion that all instances of speech identified in the plaintiff's complaint other than the filing of *Milardo I* were not made as a citizen because they owed their existence to the plaintiff's official responsibilities. The plaintiff had an official responsibility to report the Resident State Trooper's alleged harassment to the Town, ECF No. 35-50, and her grievance, her alleged rejection of resignation negotiations, and her attorney's letter were internal communications and complaints made through employment-related channels, were not conveyed to the public, and have no relevant analogue to citizen speech. *Weintraub*, 593 F.3d at 203-04 (filing a union grievance is a channel of discourse unavailable to non-employee citizens and having no relevant citizen analogue). Accordingly, the Court will look only to the plaintiff's filing of *Milardo I* to determine whether that speech regarded a matter of public concern.

### 2.    Public Concern

The Town argues that, although *Milardo I* was citizen speech, it was not speech on a matter of public concern.[7] Whether an employee speaks on a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). The

---

[7] Consistent with the concession discussed above, the plaintiff does not address any speech except *Milardo I* in her public-concern argument. *See* ECF No. 36 at 9-10.

public-concern test has proved difficult of application, particularly when (as in this case) speech takes the form of a lawsuit against a public agency.  Such lawsuits, on the one hand, often address important questions about the operation of government; on the other, they typically do so to procure relief that is purely personal to the plaintiff.

As a general rule, a lawsuit is more likely to implicate a matter of public concern if it addresses "pervasive or systemic misconduct" by public officials than if it alleges isolated instances of misfeasance.  *Huth v. Haslun*, 598 F.3d 70, 75 (2d Cir. 2010); *see also Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) ("Had Saulpaugh's complaints to her supervisors implicated system-wide discrimination they would have unquestionably involved a matter of 'public concern.'").  So too if it appears that the suit is "part of an overall . . . effort to correct allegedly unlawful practices or bring them to public attention" rather than a mere endeavor to obtain relief "of a personal nature."  *Salpaugh*, 4 F.3d at 143 (internal quotation marks and citations omitted).

However, a plaintiff with a purely personal grievance against her employer cannot transform her suit into one affecting the public interest simply by adorning her complaint with conclusory allegations of widespread misconduct or systemic abuses.  *See Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) ("The Complaint accuses the City of routinely tolerating the violation of whistleblower rights . . . arguably hinting at some broader public purpose.  However, retaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public interest.'") (quoting *Ezekwo v. New*

*York City Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991)) (alteration in original).

The question is whether the misconduct alleged in *Milardo I* was a personal matter affecting the plaintiff alone, or a pervasive issue of interest to the whole public. The Court concludes it was the latter and that the filing of *Milardo I* was therefore protected speech.

It is true, as the Town points out, that *Milardo I* was in part "a complaint about personal discrimination" based on the plaintiff's gender.  ECF No. 35-1 at 29.  The primary conduct in issue was that of Douglas Senn, another Westbrook constable who had allegedly called Milardo demeaning names, commented that he would not work with a woman, and told other constables not to sign up for shifts with Milardo to deprive her of needed backup.  ECF No. 35-5 at 4–5.  Even though they raise questions about gender discrimination within a public agency – a matter that, viewed broadly, concerns the public – these allegations are by themselves too personal to Milardo to warrant protection.  *See Saulpaugh*, 4 F.3d at 143.

But Milardo's complaint also alleged a broader pattern of discrimination within Westbrook town government and the Union.  Milardo charged that racial and gender hostility were so widespread in the Union ranks that Senn felt comfortable making offensive comments about women and racial minorities in his remarks at a Union election.  ECF No. 35-5 ¶ 30.  She asserted that a member of the Board of Selectmen had once publicly berated her at a Town event, also owing to her gender.  *Id.* ¶ 34.  She alleged that other constables abided by Senn's directive not to sign up for shifts with Milardo, endangering her and threatening to compromise the public safety.  *Id.* at ¶¶ 23-

14

28.  And she complained that despite Senn's offensive and unlawful conduct, the Union had supported him and tried to publicly discredit Milardo.  *Id.* ¶¶ 133-34.  Fairly read, the complaint paints a picture of a public agency in which the discriminatory views and actions of a few officials were known, tolerated, and facilitated by others.[8]  As a result, the Court concludes that *Milardo I* alleged systemic abuses in a government agency and that those allegations were of concern to the public.  Consequently, Milardo's speech in filing *Milardo I* was protected by the First Amendment.

### E.   Adverse Employment Actions

Not every action taken against an employee in retaliation for her protected speech violates the First Amendment.  Rather, "in the context of a First Amendment retaliation claim . . . only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action" that will support a claim.  *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks omitted).  The rule contemplates that actions short of discharge or refusal to promote can constitute adverse actions for First Amendment retaliation purposes.  The Second Circuit has made clear that less dramatic reprisals, "includ[ing] negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process

---

[8] Some courts have held discriminatory conduct to be insufficiently pervasive in part because the plaintiff failed to allege that other employees (as opposed to the plaintiff alone) also experienced discrimination. *See, e.g., Miller v. City of Ithaca*, No. 3:10-cv-597, 2010 WL 3809842, at *11 (N.D.N.Y. Sept. 22, 2010) ("Plaintiff does not identify, or complain of, specific instances of discrimination or retaliation suffered by anyone other than himself.").  *Milardo I* did not allege specific discriminatory conduct against particular individuals other than the plaintiff.  However, at the time Milardo allegedly experienced gender discrimination, she was the only female constable in Westbrook.  ECF No. 35-5 ¶ 16.  When the sole female member of a public agency alleges with particularity a workplace environment in which some officials practice gender-based hostility and others tolerate it, the Court cannot say that she has not spoken on a matter of public concern simply because no other employees experienced similar gender-based discrimination.

teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities" can all qualify. *Id.* at 226 (internal quotation marks and citation omitted).

The plaintiff has identified four purported adverse employment actions. She asserts (1) that the Town refused her requests to be placed in the July or October 2012 Academy class, even though seats were available; (2) that it refused to reinstate her as a constable in February 2012 after her three-year suspension ended (which entailed refusing to permit her to complete a one-week recertification course in lieu of the full Academy); (3) that it intentionally prevented her from attending the January 2013 Academy; and (4) that it ultimately terminated her employment. The Town argues that only the last constitutes an adverse employment action.

### 1.    July and October Academy Classes

The plaintiff argues that the defendant maliciously denied her requests to be placed in the July or October Academy class even though seats were available. The Court cannot hold that this constituted an adverse employment action, however, because the plaintiff has not introduced evidence sufficient to permit the inference that it occurred.

The defendant's brief acknowledges that the Academy hosted classes in July and October of 2012. But there is no evidence that the plaintiff asked Westbrook officials to place her in either of the earlier classes,[9] there is no evidence that Westbrook officials

---

[9] Milardo did ask a training officer at the State of Connecticut Department of Emergency Service and Public Protection if she might attend the October class, ECF No. 35-49 at 2, but no evidence suggests that this desire was communicated to the defendant.

denied her request, and there is no evidence that the Academy could have accommodated Milardo if such a request had been made.  The plaintiff's brief – which was untimely filed and which, in fourteen pages, cites to the record just twice – identifies no evidence to support Milardo's assertions on this point.  Nor does the plaintiff's Rule 56(a)(2) statement so much as mention the July or October Academy classes.  Nor has the Court's own search turned up any evidence that supports the plaintiff's argument.  Consequently, no reasonable juror could find that the Town denied Milardo's request to be placed in an earlier Academy class.

### 2.      Refusal to Reinstate the Plaintiff

After the SBMA overturned Milardo's termination and ordered her reinstatement, the Town appealed the SBMA's decision in state court.  It also declined to permit the plaintiff to obtain recertification through a one-week course instead of through a six-month Academy class.  ECF No. 36-1 ¶¶ 6-7.  As a result, Milardo was not scheduled to obtain recertification until January 2013.  Had the Town accepted the SBMA's decision and waived the Academy requirement, Milardo presumably could have been reinstated earlier.  The plaintiff argues that imposing this delay amounted to an adverse employment action.

The Town makes two arguments in response.  The first is that it did not refuse to reinstate Milardo.  Rather, it was unable to reinstate her, because her certification had lapsed.  This argument is unavailing because the record supports the inference that the Town could have streamlined her reinstatement by waiving the Academy requirement but chose not to.  ECF No. 37-3 at 5.

The Town's second argument is that delaying the plaintiff's recertification denied her a mere "training opportunity."  It identifies cases standing for the proposition that preventing an employee from receiving training is not an adverse employment action. But its cases are distinguishable.  In one, for instance, the plaintiff complained that the police department for which he worked had not approved him to attend a class about administering Breathalyzer tests.  *See Miller v. City of Ithaca*, No. 3:10 Civ. 597, 2012 WL 1977974, at *5, *7 (N.D.N.Y. June 1, 2012).  No evidence suggested that the plaintiff's missed training opportunity had any broader effect on his employment.  *Id.* at *5.  Similarly, in *Santiago v. City of New York*, No. 05-CV-3668 (RRM)(VVP), 2009 WL 935720, at *5 (E.D.N.Y. Mar. 31, 2009), the plaintiff was denied a promotion as a result of being denied a training opportunity, but did not lose her job.  Here, in contrast, Milardo's inability to obtain recertification prevented her from working as a constable. Thwarting an employee from working altogether might easily deter a person of ordinary firmness from exercising her First Amendment rights.[10]  The Court therefore concludes that the Town's refusal to reinstate Milardo *via* the one-week certification course was an adverse employment action.

### 3.  Intentionally Preventing the Plaintiff from Attending the Academy

The plaintiff argues that the Town took action against her by intentionally preventing her from attending the January Academy class.  According to Milardo, the Town procured her absence by "intentionally and maliciously" mailing her enrollment

---

[10] The defendant also argues that its refusal to reinstate the plaintiff has not affected her financially, because she has since been paid for the period between February 2012 and January 2013.  (A November 2013 administrative award ordered the Town to pay back wages.  ECF No. 35-51 at 3, 10.) This is relevant in a damages inquiry, but it does not alter the Court's conclusion that the Town's initial conduct amounted to an adverse employment action.

notification to the wrong address and by failing to sign certain forms and furnish her with equipment.  The record evidence, however, does not permit a reasonable inference that Milardo's failure to attend the Academy owed to intentional obstruction by Town officials. Accordingly, the Court concludes that these were not adverse employment actions. Three considerations inform this conclusion.

First, Westbrook has introduced evidence showing that it twice mailed Milardo's enrollment materials to her last address of record, and the plaintiff has adduced no evidence to the contrary.  ECF No. 35-47 ¶ 22; ECF No. 35-2 ¶¶ 79, 82; ECF No. 36-1 ¶¶ 79, 82.  The second time, the materials arrived by certified mail and were signed for by an "E. Milardo."  ECF No. 35-2 ¶ 81; ECF No. 36-1 ¶ 81.  Moreover, each mailing was carbon-copied to the plaintiff's union attorney.  ECF No. 35-2 ¶ 78; ECF No. 36-1 ¶ 78.  Finally, the undisputed evidence shows that when Westbrook learned that Milardo had not received her materials, it rectified the error.  *See* ECF No. 35-2 ¶ 85; ECF No. 36-1 ¶ 85.

The plaintiff has produced no evidence tending to show that the Town intentionally mailed her enrollment package to the wrong address.  Instead, she opines that Westbrook's claim of innocent error is "absurd" and that it is "ludicrous" to suggest that  a law enforcement agency is "incapable of ascertaining" a former employee's address.  ECF No. 36-1 ¶ 79.  But Westbrook does not argue that it was "incapable of ascertaining" where the plaintiff lived; it argues that it incorrectly assumed that its records reflected her current address.  Milardo offers no evidence that casts doubt on the Town's assertion of honest mistake.

Second, the plaintiff has failed to produce evidence to support its contention that the Town "refused to provide the plaintiff with the necessary materials to" attend the Academy. ECF No. 36 at 6. While Plaintiff has introduced some evidence that her lawyer was generally in contact with the Town's lawyer about getting the necessary forms and equipment, she has not introduced any evidence that the Town affirmatively refused any of her lawyer's requests. Plaintiff testified at her deposition that "[the Town] did nothing to attempt to send me to the Academy. Without the signatures on the paperwork, I could not have attended the Academy." ECF No. 35-44 at 263:10-14. This statement, however, lacks support in the record evidence. When the Town did receive notice that Milardo was struggling to make arrangements to attend the Academy – she could not procure a timely medical appointment – it quickly addressed her difficulty by engaging a doctor to perform the required examination. ECF No. 35-33 at 2. On this record, there is no factual basis from which a juror could conclude that the defendant consciously avoided furnishing Milardo with the materials she needed for the Academy.

Moreover, irrespective of the defendant's failure to sign forms and provide the plaintiff with supplies, Milardo would not have attended the Academy in any case. On December 18, the Town notified the plaintiff that it had arranged for her to have a physical before the January Academy began. *Id.* Milardo refused the Town's offer even though she knew that it would prevent her from participating in the Academy training. ECF No. 35-2 ¶ 96-97; ECF No. 36-1 ¶ 96-97; ECF No. 35-44, at 262–63. Because the plaintiff's own decision ensured that the she would fail to attend, it cannot properly be said that want of signatures or supplies caused her to miss the Academy.

Finally, even if the Court were to conclude that the defendant refused to provide Milardo with signatures and supplies and that doing so constituted an adverse employment action, such action was temporally remote from the filing of *Milardo I*, and, as discussed *infra*, Milardo has failed to adduce evidence to sufficient to permit a reasonable inference that the filing of *Milardo I* motivated such action.

### 4.    Termination of the Plaintiff's Employment

The termination of the plaintiff's employment was an adverse employment action for purposes of a First Amendment retaliation claim.  *Zelnik*, 464 F.3d at 225.  The defendant does not dispute this.  ECF No. 35-1 at 34.

### F.    Causation

A First Amendment retaliation claim fails absent some causal connection between protected speech and adverse action.  The plaintiff bears the burden to show that her speech was a "substantial motivating factor in the adverse employment action." *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).  A plaintiff may establish the requisite causal relationship through evidence of retaliatory animus, or by showing close temporal proximity between the protected speech and the adverse employment action. *Id.*  The defendant argues that Milardo has failed to adduce evidence sufficient to permit the inference that her protected speech, *Milardo I*, caused the defendant to delay her reinstatement or to terminate her employment.  The Court agrees.

### 1.    Evidence of Retaliatory Animus

Milardo asserts that she has introduced evidence of retaliatory animus by identifying "ongoing hostilities" between herself and the Town that began around the time of her lawsuit and continued until her termination in 2013.  ECF No. 36 at 12–13.

The Court understands this to be a reference to the Town's investigation of her conduct after the events of June 18, 2008, its decision to place her on paid administrative leave soon afterward, its termination of her employment in January 2009, its resistance to reinstating her after the SBMA's decision in February 2012, her ultimate termination, and harassment by the Resident State Trooper because of *Milardo I*.

Setting aside for the moment the allegations concerning the Resident State Trooper, none of these "instances of hostility" shows retaliatory animus predicated on *Milardo I*. The earliest incident the plaintiff identifies – investigation of her conduct in June 2008 – postdated the filing of *Milardo I* by more than five years. Moreover, the suggestion that this investigation was somehow motivated by Milardo's lawsuit is belied by the record. The investigation commenced shortly after Milardo and another constable failed to respond properly to a report of a citizen in danger.[11] There is no factual basis from which a juror could conclude that this incident – or those occurring later, such as Milardo's first termination and the Town's alleged reluctance to reinstate her – was substantially motivated by her lawsuit from years earlier.

The alleged harassment by the Resident State Trooper fails to support the plaintiff's argument for a different reason. Here, Milardo asserts maltreatment predicated on her protected speech, which might conceivably be argued to connect her 2003 lawsuit to the adverse actions identified in this case. But the plaintiff has introduced no evidence showing that this harassment occurred. Her brief fails to cite to the record on the point. Her 56(a)(2) statement does not mention the alleged harassment. The Court's review of the record turned up nothing to support Milardo's

---

[11] Note that the other constable, who was not the plaintiff in *Milardo I*, was likewise investigated and likewise terminated.

allegation.  Juries decide cases on evidence, not on bare assertions.  There is no factual basis in this record that the plaintiff experienced the alleged harassment after *Milardo I*.

### 2.    Temporal Proximity

For mere temporal proximity to give rise to an inference of causation, the protected speech and the adverse action must occur "very close" in time.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  The point at which a temporal relationship becomes too attenuated to support a causal inference has not been precisely identified, but generally speaking it is a question of months, not years. *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected . . . activity and the alleged act of retaliation.").

Here, the earlier of the two adverse employment actions remaining in the case – the Town's decision not to reinstate Milardo immediately after the SBMA ruling via a one-week certification course – occurred in February 2012.  *Milardo I* was filed in March 2003.  The lapse of nine years is far too long to support the inference that the two events were causally related.  *E.g.*, *Murray v. Town of Stratford*, 996 F. Supp. 2d 90, 122 (D. Conn. 2014) (temporal proximity was too tenuous to find causation where nine years separated plaintiff's prior lawsuit and defendant's decision not to hire plaintiff).

The plaintiff suggests that in determining the question of causation, the Court may properly consider speech that is unprotected under *Garcetti*, such as a 2008 complaint about harassment by the Resident State Trooper[12] and the 2009 grievance

---

[12] As is true of the harassment itself, no record evidence shows that this complaint actually occurred.

that followed her first termination.  These instances of speech, of course, occurred closer in time to the events of 2012-13 than did *Milardo I*.  The plaintiff argues that they provide a "linkage" establishing that the "adverse actions by the defendant that followed those unprotected complaints were in fact motivated by the initial lawsuit."  ECF No. 36 at 9.

This is unpersuasive.  Because these instances of speech were unprotected, the Town was free to respond to them by taking action against her.  As to the argument that the Town's alleged decision to retaliate against Milardo because of her 2009 wrongful termination grievance establishes that it was actually retaliating against her because of her 2003 gender-discrimination lawsuit, there is no factual basis in the record for inferring that Westbrook retaliated against Milardo because she grieved her termination.

Because the plaintiff has not demonstrated a causal connection between her protected speech and an adverse employment action, summary judgment will enter for the defendant.[14]

## III.   CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment (ECF No. 35) is hereby granted.  The clerk is directed to enter judgment in the defendant's favor and to close this case.  SO ORDERED at Bridgeport, Connecticut this tenth day of August, 2015.

 /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[14] In light of this disposition, the Court does not reach the Town's argument under *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).